# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CA-00363-COA

**MICHAEL CLANTON DAVIS**                                                      **APPELLANT**

**v.**

**EMILY DAVIS**                                                                       **APPELLEE**

DATE OF JUDGMENT:            12/23/2024
TRIAL JUDGE:                 HON. ROBERT M. LOGAN JR.
COURT FROM WHICH APPEALED:   JASPER COUNTY CHANCERY COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:     THOMAS L. TULLOS
                             THOMAS LEWIS TULLOS II
ATTORNEY FOR APPELLEE:       JEFFREY BIRL RIMES
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 07/21/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND LASSITTER ST. PÉ, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    Michael Davis appeals a Jasper County Chancery Court judgment that granted an irreconcilable differences divorce to him and his wife, Emily Davis, and awarded custody of their minor child to Emily. On appeal, Michael contends that the chancery court erred in failing to properly consider Emily's mental health and in failing to award custody to him. Having reviewed the record, the arguments of counsel, and the relevant precedent, we affirm the chancery court's judgment.

## Facts and Procedural History

¶2.    After living together since 2017, Michael and Emily married on April 4, 2021, and

had one child, M.C., who was born in 2021.[1] Michael, who graduated from Mississippi State University, worked for the Natural Resource Conservation Service as a soil technician. In addition, he owned and operated a 266-acre cattle farm with 100 cows and tended to thirty more that he kept at his parents' farm in York, Alabama. Emily was a family nurse practitioner who, at the time of the trial, worked with a home-health company four days a week in Jackson and one day a week in Meridian.[2] The parties separated on March 17, 2022. Michael claimed Emily attacked him with a hammer; Emily said that she left the home because Michael choked her.

¶3.     Michael filed a complaint for divorce on April 27, 2022, alleging as grounds Emily's habitual cruel and inhuman treatment and mental illness or intellectual infirmity. Michael asked for temporary relief, including temporary custody of M.C. and temporary child support. Emily answered the complaint, denied Michael's allegations, and filed a motion for temporary relief as well. She later filed a counterclaim for divorce against Michael, claiming habitual cruel and inhuman treatment as the ground.[3]

*Temporary Order*

---

[1] We use initials to protect the child's privacy.

[2] After she married Michael in April 2021, Emily worked at Magnolia Pediatric Extended Care in Laurel, University of Mississippi Medical Center, South Central Regional Medical Center, Caring Hands Prescribed Pediatrics, and Rush Foundation Hospital and began as a nurse practitioner at United Healthcare in December 2021, where she still worked at the time of the trial.

[3] Emily filed her counterclaim on January 5, 2023. Michael filed his response on August 9, 2024.

¶4. On June 8, 2022, the chancery court entered a temporary order granting Emily temporary custody of M.C. and liberal visitation to Michael. The court ordered Michael to pay $460.00 per month in child support, and pursuant to Mississippi Code Annotated section 9-5-89 (Rev. 2019), the court appointed attorney Brian Mayo as the child's guardian ad litem (GAL) to investigate and report to the court about issues relating to the best interest of the minor.[4] The court specified that Michael and Emily each had the right to file written objections to the GAL's report.

*GAL Preliminary Report*

¶5. The GAL filed his preliminary report on December 31, 2022, after interviewing the parties and witnesses, reviewing some medical records, and listening to audio and video recordings Emily gave him. The GAL summarized the information he gained from these interviews as well as his observations of the child's interactions with each party in his preliminary report. The GAL referred to a December 8, 2022 letter that Emily had provided to him from a nurse practitioner named Tina Clearman, who was treating Emily. Clearman indicated that Emily was compliant with her medications and that her documented mental-health conditions no longer had any negative impact on Emily's daily activities. This letter was not included in the record. In his report, the GAL noted dysfunctions in the marriage relationship, but he concluded that the parties' problems with each other did not affect their

---

[4] The court further ordered that the GAL obtain any relevant records, interview witnesses, and file a detailed written report, including proposed findings of fact and conclusions of law on all issues.

3

care of the child. The GAL reviewed each *Albright* factor[5] and recommended that the parties share joint legal custody, that Emily be awarded physical custody of the child, and that Michael be granted extended visitation. Neither party filed objections or comments to the GAL's report.

¶6.     Over the next two years of litigation, the parties propounded discovery and filed motions to compel. On April 10, 2023, Michael designated Dr. Laura A. Brody as an expert witness in the fields of psychology and family counseling.

*GAL Supplemental Report*

¶7.     On September 2, 2023, the GAL filed a supplemental report, including a detailed review of Emily's mental-health treatment in detail dating back to 2017, as well as counselors' opinions on both parties' mental health. The GAL further reported:

> The Fast Pace Health records from Erica Flake for Emily range from August of 2023 through March 12, 2024. These records indicate that Emily has had no medication or mental health treatment since March of 2023. The records indicate that Emily's major depression disorder was in full remission and that Emily denied anxiety.

However, these Fast Pace Health records were not entered into evidence at the later trial, and they do not appear in the record. The GAL also interviewed Michael's expert, Dr. Brody, who had evaluated Michael and found him to be introverted and work-driven with nothing that would impair his parenting ability. Brody also told the GAL that she did not give much

---

[5] In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the supreme court set out a number of factors a chancellor should consider when determining custody of children, including, inter alia, the physical and mental health of the parents. *See infra* ¶34.

credence to Emily's mental health issues being in remission and that she felt that Emily needed testing and consistent therapeutic treatment.

¶8.     The GAL reviewed the *Albright* factors again and found the "physical and mental health and age of the parent" factor favored Michael as well as the factor of the stability of the parent's home environment and employment. The only factor that favored Emily was the child's continuity-of-care factor. All other factors the GAL rated as neutral. The GAL had concerns with the incident of domestic violence between the parents on the day of their separation, although it was unclear who was the aggressor. Further, because of his concerns about Emily's mental health, the GAL reserved his final recommendation until he heard the testimony presented at trial.

*Trial*

¶9.     On September 5, 2024, the parties signed a joint motion to withdraw their fault grounds and proceed with an irreconcilable differences divorce. They also agreed that the chancellor would adjudicate only the issues of custody, visitation, and support of the child.[6] On September 5, 6, and 24, 2024, the chancery court heard testimony from several witnesses, including Emily, Michael, Michael's mother Becky Davis, Dr. Brody, Emily's sister Molly Garner, and the GAL.

¶10.    The testimony of these witnesses described a five-year relationship of two responsible

---

[6] On October 17, 2024, Michael and Emily signed and filed a property settlement agreement that resolved all other issues between them.

and achieving individuals who ultimately could not resolve issues in their marriage. Because the parties agreed to an irreconcilable differences divorce, the details of their conflicts as a couple (e.g., the events of the day the parties separated) are not specifically relevant to the chancellor's custody decision on appeal. Michael challenges that decision based on the evidence he presented concerning Emily's mental health history, including her treatment history for anxiety, depression, post-traumatic stress disorder (PTSD), and attention-deficit hyperactivity disorder (ADHD), and testimony of what he argues is the need for Emily to be tested and continue therapy.

*Emily's Mental Health Treatment*

¶11. When they met in 2016, Emily was working as a nurse at Forrest General Hospital (FGH) and living at home with her parents. She moved in with Michael in 2017. Because low-cost counseling at Pine Grove Behavioral Services, a subsidiary of FGH, was available to employees, Emily started therapy in October 2017. Emily told her therapist that she had moved in with Michael after she had slapped her mother during an argument, and her father threw her on the couch and hit her. She later wrote her parents a letter and told them that she no longer wanted any contact with them. She also told the therapist that she had almost been sexually assaulted by an older male friend. In her testimony at trial, however, Emily denied both the parental abuse and the near sexual assault, and she told the chancery court that she had lied to her therapists. Emily told the court that there had been an incident with her father when she was twenty-one years old. She was living at home and had not cleaned the house

as she should have. Her father told her that he was tired of her being sassy and not cleaning up, and he slapped her in the face. Emily said that was all that had happened.

¶12. Over the years, Emily sought continued help for her anxiety and depression. From October 2017 to January 31, 2018, she was treated at Pine Grove. She reported being depressed, worrying, having lack of motivation, experiencing family stressors (including parental abuse), and being overwhelmed by situations. She said she could not concentrate, think straight, or make work decisions. Emily was initially diagnosed with an adjustment disorder with depression. The initial assessment also records a need to rule out BPD (borderline personality disorder). However, Emily was never tested or further evaluated for BPD. According to Pine Grove records, her full diagnosis included PTSD, ADHD, and binge-eating disorder. In addition to individual therapy, Emily was also prescribed medications to treat these conditions.

¶13. From April 2018 to January 6, 2022, Emily saw Erica Flake (a family psychiatric-mental health nurse practitioner) and Lowell Wallace (a licensed clinical social worker). Emily reported similar anxiety and depression, now including her not being appreciated by her husband. Flake treated Emily for "major depressive disorder, recurrent, moderate; generalized anxiety disorder; other specified eating disorder; post-traumatic stress disorder, unspecified." She prescribed medication and therapy sessions twice a month. During her time with Flake, Emily was working on a master's degree in nursing online. In December 2019, both she and Michael testified that she was under a great deal of stress trying to finish

school while working full-time. Emily testified that her therapist suggested she request a thirty-day medical leave from work. After that leave, she took another leave in June 2020 and continued therapy twice a month. Emily discontinued medication when she got pregnant because she did not want it to affect the baby.

¶14. Emily saw Diane Eldridge, a therapist in Tupelo, remotely twice in January 2022. Emily reported that her mind jumped from task to task and that she often got overwhelmed and upset because she was not getting anything accomplished. She also relayed problems in her marriage and that she was anxious, irritable, and unable to relax. Eldridge treated her twice with medication and therapy. But Emily discontinued working with Eldridge, opting for in-person care, apparently with Flake.

¶15. Emily began her counseling treatment with Tina Clearman, a member of the Association of Psychiatric Mental Health Nurse Practitioners, after Michael and Emily separated in March 2022 and the divorce proceedings had begun. At a visit in January 2023, Clearman diagnosed Emily with PTSD and ADHD, and prescribed medication and therapy every three months. Emily reported no depression, sadness, or paranoia, and she had lost weight.[7] She did well on her medications, and as time progressed, by September 2023, Clearman documented that Emily was off her medications. In her sessions with Emily, Clearman discussed coping skills and the adoption of a healthy lifestyle.

---

[7] Between the time the couple separated in March 2022 and the trial in September 2024, Emily had lost over ninety pounds.

¶16. At trial, Emily testified that she was no longer taking medication and that "all of my problems are resolved at this time." She stated that Flake had discharged her to return for therapy on an "as needed" basis. Emily agreed that symptoms of her condition could "flare up" if she is stressed, but she would not agree to any testing, nor did she feel she needed any ongoing therapy.

*Evidence of Other Conversations*

¶17. Besides Emily's treatment records, the court admitted audio-tapes that Michael had recorded of Emily before the separation. One was a recorded phone call between Emily and her mother at Christmas 2021, when Michael took the child to his parents' home without Emily since she refused to apologize for telling his parents to stay out of their marriage. In the recording, Emily was sobbing and saying that she just wanted to die. In another recording, Emily screamed that she hated Michael and that she wanted to kill him and kill his mother too because "she's the reason we have all these problems." Michael also entered photographs of the interior of their trailer, showing how unkempt it was while they were married. Emily explained that these were taken during the COVID-19 pandemic, when she and the child were sick.

¶18. After the temporary order was entered, Emily and Michael started to communicate through a parenting app, AppClose. A transcript of their communications through the app was also entered into evidence. These communications reflect the difficulties the two had in adjusting to sharing custody of M.C. and how both Michael and Emily would message

9

each other about the child, sometimes over thirty times a day.

*Other Testimony*

¶19.    At the time of trial, both Emily and Michael had family support. Michael's mother, Becky Davis, testified that she had taught in daycares for over thirty years and that she was willing to help Michael with M.C., even if Becky needed to move in with him. She described the things Michael does with M.C. and how happy M.C. is with them. Emily testified that she had reconciled with her parents, who take care of M.C. one day a week (on the other four days, M.C. attends daycare in Jackson when Emily is working there). Emily's sister, Molly Garner, testified that she leaves her fifteen-month-old with her parents as well and that Emily takes care of her child once a week on her and her husband's date night. However, Emily did say that she was thinking of moving to Madison, Mississippi, to be closer to work.

*The Child*

¶20.    Both parties testified about their love and care for M.C., who was three at the time of the trial. Michael testified about the child's problem with constipation that required him to take the child to the emergency room, where he said that M.C. had to be given an enema. He indirectly blamed Emily because he said that the child's problems resolved after eating the healthy food he fed her. Emily said she dealt with the problem with Miralax and that emergency room treatment was unnecessary. She further faulted Michael for not telling her about an incident when a tree fell on his mother's car while his mother and M.C. were in it. The child was not injured, but Michael did not report this to Emily; she found out when his

10

mother was brought to be checked out at the hospital where Emily was working.

¶21.   Emily described how she handled the child if the child looked like she was getting upset, giving several examples.  Her sister Molly lived about two miles from her parents and had seen Emily every day or every other day since Emily moved back in with them.  Molly testified that although M.C. was a "ball of sunshine" and very smart, she did have a temper. When M.C. acts out, Molly said Emily would tell the child to talk about it and redirect her. The child has had only one spanking when she was playing with an electric outlet.  In addition, Emily told the court that she had taken a parenting course offered by Mississippi State University called "Protect and Connect," which dealt with child development and discipline and handling the stress of parenting.

*Dr. Laura Brody*

¶22.   Michael presented testimony about mental conditions through Dr. Laura Brody, whom the court accepted as an expert in psychology.[8]  Dr. Brody testified that she could not diagnose Emily herself (or anyone she has not treated).  However, she was asked and allowed to testify in general about the conditions other psychologists had diagnosed Emily to have, the symptoms of those conditions, and the usual treatment for such conditions.  These included ADHD, anxiety, depression, PTSD, and BPD.

---

[8]   Brody had a bachelor's degree in psychology from Baylor University, and a master's and doctorate in psychology from Biola University in California.  She had performed evaluations in both criminal and civil settings and had her own practice in California from 1996 to 2020, when she moved to Mississippi.  She is licensed in the state and began a practice in Gulfport.  She had lectured and taught at several universities as well.

¶23. Dr. Brody said anxiety and depression can be "cleared up" with medication and therapy. However, PTSD could sometimes "clear up" and sometimes not. Brody said, "It depends on actually how soon you get your therapy hands on someone who has issues of the PTSD." Further, Brody stated that both ADHD and BPD tend to be lifelong issues.

¶24. Brody clarified that despite the word "borderline," BPD was a severe personality disorder. "It's people between psychotic and neurotic and with a push hard enough, they become psychotic." Symptoms can include anger and rage, depression, feelings of emptiness, sometimes substance abuse or threats of suicide. In Dr. Brody's opinion, patients with BPD needed medication and weekly therapy, including dialectical behavior therapy where they are taught the triggers of their condition and how to cope with them. There is no cure, Brody said, but people can live with it and experience very fulfilling lives. When asked how these disorders would impact a person's ability to be an effective parent, Brody responded that it was difficult to say, and it depended on the person's emotional state at the time. Again, Brody never treated or evaluated Emily.

¶25. Dr. Brody further opined that the records reflect Emily had not undergone objective psychological testing, which she felt Emily needed to get to her core problem that other disorders may be mere symptoms of. However, Brody had tested Michael using the Personality Assessment Inventory (PAI), the Minnesota Multibasic Personal Inventory II (MMPI), the Millon Clinical Multiaxle Inventory (MCI-IV) and Child Abuse Potential Inventory (CAPI)—the same tests she would use to diagnose BPD. She found that Michael

12

did not suffer from any serious psychological disorder that would impair him from parenting and that he did not have the ideas or beliefs of someone who would physically abuse a child. The tests showed he had the ability to bond with the child, could set the appropriate limits with the child, and that he has a very strong work ethic. Brody said she was also skeptical that a person with Emily's mental-health history could suddenly be fine for a year and a half without any therapy.

*Brian Mayo (GAL)*

¶26. Mayo, the GAL, testified and reviewed his *Albright* analysis, factor by factor. He noted that he had previously withheld a final recommendation until he heard all the testimony. He reviewed each *Albright* factor as follows:

1. Age, health, gender of child factor: neutral;

2. Continuity of Care factor: favored Emily;

3. Parenting skills and willingness factor: he noted that both can and do care for the child.

At first, he questioned Michael's bond with the child, but he found it to be strong now. The GAL was still concerned about Emily's mental capacity and the diagnoses given, as well as Emily and Michael's inability to work together. Thus, the GAL weighed this factor was slightly in Michael's favor;

4. Employment responsibilities factor: neutral

5. Physical and mental health and age of parents factor: favored Michael.

The GAL noted that physically, Emily has improved, lost weight, and adopted an exercise

regimen. But he could not ignore that historically, she also has been diagnosed with multiple mental conditions. Some can and others cannot be treated with medication and therapy. It concerned the GAL that Emily was not continuing with some type of therapy, especially since she planned to move to Madison, away from family support. So he favored Michael on this factor.

6. Moral fitness factor: neutral.

7. Home, school and community of child factor: favored Emily.

At first the GAL had found this factor to be neutral, but later felt this home/school factor favored Emily slightly because of the continuity of care and established routine the child had with school and church.

8. Preference of the child factor: not applicable;

9. Stability of parent's home factor: neutral;

10. Difference in lifestyle factor: neutral;

11. Other factors: Although the GAL noted that the parents are suspicious of each other, his biggest concern was Emily's mental health.

He agreed that she was not the same person he met when he was first appointed GAL; she has improved and developed coping skills to deal with many of her problems. But he was concerned about her moving away from her support base. He told the court that the "overlying concerns here really are Emily's mental health and whether or not what we have before the court is of sufficient concern," pointing out that there had been no definitive

14

testing of Emily to confirm or dispel a BPD diagnosis. The GAL was also concerned that Emily did not tell therapists what was really going on. She told them things that she now says are not completely true regarding her parents. Despite this, the GAL recommended that primary physical custody be awarded to Emily with joint legal custody. He recommended further that the parties only use the AppClose app to communicate during visitation and Facetime calls only when the visitation period is long. The GAL did not think the child needed counseling at this time. When cross-examined, the GAL said he was aware that Emily suffered from psychological problems that are chronic and recurring. He said testing would be beneficial and that the need for any ongoing therapy would be determined by the results of that testing. The GAL also said that if the court determined Emily should be evaluated, a court order should be entered because of Emily's stated refusal to be tested.

*Court's Findings of Fact and Conclusions of Law and Final Judgment*

¶27. On November 11, 2024, the chancery court issued its findings of fact and conclusions of law. The court summarized the court filings in the case and noted both parties' employment status, which yielded both substantial income. The court recognized that Emily's mental health issues began before the marriage but found that she had received therapy with several providers and was discharged from all treatment in February 2024. The court noted that Emily related an assault by her father in her medical history but in court, she denied being "assaulted" by him. Noting that Michael and Emily had a different version of events on the day of separation, the court stated that it could not assign a "cause" for the

15

separation and "left it as saying the two could not get along." The court then reviewed the *Albright* factors, often referring to the GAL's findings.

¶28. The court agreed with the GAL on the age, health, gender of child factor, finding it neutral, and that the continuity of care factor favored Emily because she had taken care of the majority of the childcare responsibilities prior to separation.

¶29. The court noted that the GAL had weighed the parenting skills and willingness factor slightly in Michael's favor, largely because of Emily's mental and emotional stability. However, the court found that her PTSD and BPD were not diagnosed by competent and qualified professionals for the court to rely on those diagnoses. The court found both parents had adequate parenting skills. Both had demanding jobs, and both had family to help. Because Emily has medical training and has been more involved in the care of M.C., the court weighed the factor slightly in favor of Emily.

¶30. Because Michael was an employee of NRCS and operated a 266-acre farm that he worked seven days a week, the court disagreed with the GAL on the employment responsibilities factor and found this factor favored Emily because she does not work on weekends.

¶31. In discussing the physical and mental health and age of parents factor, the court found no issue was raised about Michael's mental health. The court found Emily admitted to suffering from depression, anxiety, ADHD, and binge eating. Again, the court noted that no licensed psychologist or medical doctor had diagnosed her with PTSD or BPD. Her mental

16

issues, the court stated, have been severe at times, and she was estranged from her immediate family for an extended period of time. The court did not fault Michael for this, but stated that Emily's father apparently physically assaulted her when she was twenty-one and they had only recently reconciled. The court noted Emily's years of treatment with Erica Flake and Ted Crawford and that she stopped taking medication in February 2023, relying on exercise, diet, meditation, and prayer to deal with her stress. She had lost a significant amount of weight, over ninety pounds. The court noted that Dr. Brody testified that anxiety and depression can resolve, but ADHD is a lifetime issue and PTSD may or may not clear up. Dr. Brody said that an accurate assessment of BPD requires testing and analysis by a doctorate-level psychologist, which Emily had not been given. The court agreed with the GAL that this factor favored Michael.

¶32. The court agreed with the GAL that the moral fitness factor was neutral and that the home, school, and community of child factor slightly favored Emily, although the court did not find this factor to be particularly significant. The court also found that the preference of the child factor was not applicable.

¶33. The court adopted the testimony of the GAL and found the stability of parents' home factor to be neutral. The court further found the financial status of the parties factor was neutral because both parties had good, stable jobs, and ample financial ability to support M.C. The court also found neutral the religion of the parents and the lifestyle of the parents.

¶34. Considering other factors, the court was concerned about the intense mistrust between

the parties and how that might affect the child. The court stated it had the "nonpleasure" of reading the 116 pages of their dialogue on AppClose as well as reviewing over 100 pages of photos and documents. The court noted Emily's remark that she would share all this dirty laundry with the child when she is older, which the court hoped Emily did not mean seriously. The court found that there had been only one documented act of violence between the parties, causing the court to question why the visitation exchange had to be at the police station. The court noted other instances of non-communication, such as the accident where the tree fell on the car, Michael's failure to tell Emily about it, and Emily's selecting daycares for the child without consulting Michael. Michael refused to swap visitation dates to give M.C. an opportunity to go to Disney World, but Emily held days and minutes of visitation "like a sword" over Michael's head. The child called each parent "a piece of shit," which she had heard somewhere. Finally, the court found that the constipation controversy illustrated the level of dysfunction between two parents "who could not even agree on what amount of MiraLAX to give the poor baby." The court also considered that even though Michael is capable of exercising physical custody of the child, he has had little time alone with M.C. Almost all visitation had been in the presence of his mother, who came from York, Alabama, to help.

¶35. The chancellor concluded that the case was the most difficult he has faced while on the bench. While the parties had positive qualities, they also had many "bad tendencies." The court found they could not co-parent. The court awarded physical custody of M.C. to

18

Emily but joint legal custody to both. Michael was granted visitation on the first, third, and fifth weekends along with other specified visitation.[9]

¶36. The court finally noted that the GAL had suggested deferring the entry of a final judgment "until such time as Emily has been tested for BPD and counseling has been provided for M.C." The court stated:

> The court concedes that both of these are needed, but declines to prolong the litigation, as the parties are already too court-conscious and need to get away from litigation. All the attorneys involved are aware of the process of modification if the need arises.

¶37. Thereafter, the court entered a final judgment of divorce on December 23, 2024, in which the court granted the parties a divorce on the ground of irreconcilable differences and granted Emily custody of the minor child and Michael generous and detailed visitation.

¶38. Michael filed a motion for a new trial, and Emily filed a motion to alter, amend, or correct the judgment.[10] The chancellor denied both motions, and on March 31, 2025,

[9] The court also ordered Michael to pay $450 per month in child support, provide medical insurance on the child, and share all other expenses not covered by insurance equally. The court alternated the parties' claiming the child for tax purposes, with Michael claiming her in even-numbered tax years and Emily in odd-numbered years. The parties were ordered to share the expenses of any education M.C. decides to pursue beyond high school. They were also ordered to pay half the cost of a vehicle for her when she becomes of age.

[10] Michael argued that the court had erred in refusing to allow his expert, Dr. Brody, to testify directly about Emily's conditions because Brody had not examined Emily. Further, Michael pled that the court erred in finding Emily had not been diagnosed by competent medical personnel, and relied solely on the GAL's testimony despite his lack of a medical or psychological background. Michael also alleged that the court had "discounted the validity" of Emily's mental health history and erroneously found that Emily was managing her mental health problems without therapy. Further, Michael claimed that the court also

19

Michael filed his notice of appeal.

¶39.    On appeal, Michael argues that the chancery court erred when it failed to properly consider Emily's mental health and failed to award custody of the minor child to him. Specifically, Michael argues that the chancery court's decision was manifestly wrong and clearly erroneous, that the court ignored the testimony of Dr. Brody regarding Emily's mental health, that the court failed in its duty to have Emily tested by a qualified psychologist, and that the court failed to take necessary actions to protect the child from harm.

**Standard of Review**

¶40.    "This Court will not reverse the chancellor's custody decision unless the chancellor abused his discretion, was manifestly wrong, or clearly erroneous, or applied an erroneous legal standard." *Adams v. Adams*, 400 So. 3d 517, 523-24 (¶17) (Miss. Ct. App. 2025) (citing *Smith v. Bellville*, 301 So. 3d 678, 682 (¶8) (Miss. Ct. App. 2020)). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Id*. (citing *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004)).

**Discussion**

---

erred by failing to require Emily to submit to independent mental/psychological testing.  In her motion to amend the judgment, Emily asked the court to revisit the holiday and telephonic visitation it granted Michael, and an alleged "imbalance" created in allowing Michael to claim the minor child as a dependent in alternating tax years.

¶41. "The polestar consideration in child custody cases is the best interest and welfare of the child." *Edwards v. Edwards*, 421 So. 3d 1248, 1253 (¶9) (Miss. 2025) (quoting *Albright*, 437 So. 2d at 1005). To determine what custody arrangement is in a child's best interest, chancellors evaluate key factors concerning the child's health and care, home and school environments, and the child's relationship with the parents, as well as factors relating to the parents' fitness, employment, and stability. The *Albright* factors include:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*Id*. However, "the *Albright* factors are a guide. They are not the equivalent of a mathematical formula." *Id*.; *see also Adams*, 400 So. 3d at 534 (¶18) (citing *Polk v. Polk*, 332 So. 2d 348, 353 (¶16) (Miss. Ct. App. 2021)). The factors are not weighed equally, nor should they be used in an arbitrary manner. *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003).

> Child custody is a matter of equity which requires more than counting the votes in favor of the mother or father. A single factor can weigh so heavily in favor of one party that equity would require granting custody to that parent.

*Id*.; *see also McLellan v. McLellan*, 397 So. 3d 860, 867 (¶34) (Miss. Ct. App. 2024).

¶42. "In order to determine whether or not the chancellor was manifestly wrong or clearly

21

erroneous, or abused [his or] her discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial to ensure [his or] her ruling was supported by the record." *Adams*, 400 So. 3d at 524 (¶18). As previously stated, "[w]e will not arbitrarily substitute our judgment for that of the chancery court[,] which is in the best position to evaluate all factors relating to the best interest of the child." *Dobson v. Dobson*, 179 So. 3d 27, 29 (¶5) (Miss. Ct. App. 2015) (citing *Brumfield v. Brumfield*, 49 So. 3d 138, 142 (¶9) (Miss. Ct. App. 2010)). "In other words, the issue is not whether this Court 'agrees with the chancellor's ruling' but only whether 'substantial evidence' supports the chancellor's ruling." *McLellan*, 397 So. 3d at 867 (¶25).

¶43. In the case at hand, the chancery court reviewed the eleven *Albright* factors and found one not applicable (the child's preference), found eight factors neutral, found two factors favoring Emily (the continuity of care of the child and parenting skills/willingness to have custody) and found one favored Michael (physical and mental health and age of parents). On appeal, Michael mainly challenges the court's findings concerning Emily's mental health and history of mental disorders. He argues that Emily refused treatment for BPD, that Emily's depression needed treatment, that her ADHD endangered the child, and that her PTSD has not been adequately addressed. Further, Michael argues that his expert, Dr. Brody, clearly established Emily's past mental-health diagnoses and the treatment she needed. However, despite Michael's arguments, the lengthy record we have reviewed contains substantial evidence supporting the chancery court's findings, and we find no reversible error

22

in the chancellor's rulings.

> ## I. Whether the chancellor should have ordered Emily to continue therapy.

¶44. Michael argues that the chancellor erred in not requiring Emily to be monitored and treated for her depression disorders. As evidence to support this, Michael points to times in 2019 and 2020 when Emily had to take leaves of absence from work because of stress and anxiety. However, more relevant to the custody decision the chancellor had to make was Emily's condition at the time of trial in September 2024.

¶45. The medical records entered into evidence do establish that from 2018 through 2023, Emily was diagnosed and treated for several mental-health conditions, including anxiety, depression, ADHD, PTSD, post-partum depression, and binge eating. However, according to Dr. Brody, the only medical doctor to testify, anxiety and depression were treatable and could be resolved through medication and therapy. Dr. Brody also said PTSD could also be "cured" if treated in a timely fashion in a similar way. Further, ADHD may not be curable, but it could be managed with therapy to develop coping mechanisms.

¶46. Besides diagnoses, Emily's records also reflect her treatment for her conditions, including medication and ongoing therapy. Although the last records admitted into evidence from Tina Clearman, dated September 23, 2023, indicated that Emily still suffered from PTSD, Clearman felt Emily only needed follow-up therapy every ninety days. Moreover, the GAL noted that he had received more recent records from Erica Flake from August 2023 to March 12, 2024. The GAL reported in his pre-trial supplemental report that these "indicate

that Emily's major depression disorder was in full remission and that Emily denied anxiety." Admittedly, as Michael points out, Emily called no medical provider to testify in her behalf, but he failed to present any testimony or records to rebut the most current assessments by Clearman and Flake, both psychiatric nurse practitioners. Further, both Emily and her sister testified about how Emily now copes with her ADHD and stress she encounters through diet, exercise, Bible study, and church services and activities. In *McCraw v. McCraw*, 841 So. 2d 1181, 1184 (¶14) (Miss. Ct. App. 2003), we affirmed a chancellor's decision granting custody to a mother even though she had previously been committed to a mental facility. We noted that she was not on any medication, and nothing in the record showed that she was physically or emotionally incapable of providing care to her children. Similarly, in this case, Emily's prior mental-health issues were in remission, and there was no evidence that as of September 2024, Emily was suffering from mental disorders that prevented her from caring for M.C. Accordingly, we find no substantial evidence in the record that would require a reversal of the chancery court's decision not to require Emily to continue treatment for her mental-health conditions.

## II. Whether the chancellor should have required Emily to undergo diagnostic testing and treatment for BPD.

¶47. Michael further argues that the chancellor erred in not requiring Emily to be tested and treated for BPD. However, although his expert, Dr. Brody, felt Emily should be tested, Brody admitted she could not diagnose Emily because she had not treated her. Moreover, Michael provided no evidence that Emily was exhibiting symptoms of BPD at the time of the

24

trial. Thus, there was no medical or psychiatric basis for mandating that Emily undergo testing.

¶48. Here the chancery court found that Emily had not been previously diagnosed with BPD by any licensed psychologist or medical doctor, a finding that the record supports. Although the records of Emily's initial visit to Pine Grove reflect that a provider with a doctorate in psychology participated in her assessment in October 2017, this person diagnosed her with only an anxiety disorder and indicated that Emily may also have BPD, which he stated needed to be "ruled out." However, the records do not show that this doctor ever assessed Emily thereafter, nor that anyone performed the tests that Dr. Brody suggested were necessary to definitively diagnose BPD. After her sessions with Crawford at Pine Grove ended in January 2018, Emily was treated by several other therapists, none of whom tested or diagnosed her with BPD.[11] Accordingly, we find no error with the chancellor's factual finding that Emily was never previously tested or diagnosed with BPD.

¶49. Nor was there any evidence of Emily exhibiting BPD symptoms at the time of trial such that the chancellor should have ordered her to be tested. The medical records closest to the date of the hearing in September 2024 that were admitted into evidence were those of Tina Clearman, the psychiatric nurse practitioner. They reflect Emily as a mentally healthy

---

[11] Even though Emily told Donna Eldridge in January 2022 that she had been diagnosed with BPD, Emily only saw Eldridge twice, and Eldridge did nothing to confirm this diagnosis or treat it. Emily further testified that she told Erica Flake that Crawford told her she had BPD, and that Flake told her, "Emily, you don't have it," and never recommended testing for it.

25

individual who had developed adequate coping skills to deal with the stresses of life and parenting. In addition, according to the GAL's supplemental report, there are also records from Erica Flake in March 2024 (just a few months before trial), reporting that Emily's mental disorders were in remission.[12] Both document Emily's growth in dealing with stress and her declining need for medication. Thus, for at least the eighteen months before trial, no therapist treating Emily documented her as having any of the symptoms of BPD that Dr. Brody described (anger/rage, depression, emptiness, boredom, substance abuse, suicide, difficult interpersonal relationships). The GAL even agreed that Emily was a different person than when he first met her, and he recommended that she be granted physical custody of the child even though she had never been tested for BPD.

¶50. "Matters involving child custody are within the sound discretion of the chancellor." *Ingram v. Ingram*, 419 So. 3d 991, 995 (¶7) (Miss. Ct. App. 2025). Michael provides no authority requiring the chancellor to order a party to undergo psychological evaluation, even if the GAL felt it may be beneficial. "Chancery courts are not obligated to abide by a guardian ad litem's recommendation." *Martin*, 282 So. 3d at 708 (¶17); *see also Lowrey v. Simmons*, 186 So. 3d 907, 913 (¶12) (Miss. Ct. App. 2015) (quoting *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1082 (¶17) (Miss. 2000) (providing that "there is no requirement that the chancellor

---

[12] Although these medical records were not admitted into evidence, the GAL reviewed them, and Michael did not object to the GAL's report in which they are referenced. The GAL's duty is to gather information for the court, *Martin v. Martin*, 282 So. 3d 703, 708 (¶17) (Miss. Ct. App. 2019), and the court should be able then to rely on the GAL to accurately report on the contents of the records he reviewed.

defer to the findings of the GAL")). The chancellor noted that the parties had experienced enough courtroom drama, and should Emily's behavior warrant it, the attorneys for both were familiar with the procedures to seek a modification of the court's order. In summary, we find substantial evidence in the record to support the court's ruling and nothing that would lead us to hold that the chancellor was manifestly wrong in not ordering Emily be tested for BPD.

### III. Whether the chancellor erred in granting Emily custody in light of Emily's ADHD diagnosis.

¶51. Michael next argues that Emily should not have been awarded physical custody of M.C. because Emily's ADHD diagnosis endangered the child. To support his claim, Michael refers to an incident when M.C. was one-year old and Emily left the child unattended in the bathtub. Michael contends that a parent should be able to focus to adequately care for a child, and this instance showed Emily could not keep her focus. However, as both parties described the isolated incident, the child was in a stable bath chair, adequately supported on all sides, in about one or two inches of water. They both left the child to have sex in the adjacent bedroom. If anything, both should be faulted, not Emily's ADHD.

¶52. Moreover, even Dr. Brody testified that ADHD can be treated with medication and coping mechanisms so that an individual can live a productive life. Clearman's records from 2023 reflect that Emily's treatment had yielded such a successful outcome. In addition, Emily testified to the parenting course she had taken at Mississippi State University and the parenting and coping skills she had learned. Michael cites no other incidents or evidence in the record of any time that the child was endangered by Emily's ADHD. Accordingly, we

27

find no merit to Michael's claim that the chancellor erred because of Emily's ADHD diagnosis.

### IV. Whether the chancellor erred in the award of custody.

¶53. Michael recites Emily's alleged PTSD from "parental abuse"[13] and the panoply of mental disorders Emily was treated for during their marriage as evidence that the chancery court should have weighed the *Albright* mental health factor more heavily in his favor. Michael cites several cases that strongly advise trial courts to scrutinize a parent's psychological condition when weighing the *Albright* factors. For example, in *McPhail v. McPhail*, 357 So. 3d 602, 608 (¶26) (Miss. 2023), the Mississippi Supreme Court stated that a parent's "psychological makeup, as a potential detriment to the children, [is] certainly a valid factor to consider when awarding permanent custody." However, the facts of the case at hand are distinguishable from the facts of the cases that Michael argues are applicable, and there was no evidence presented that Emily's current mental health affected her ability to care for M.C.

¶54. In *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003), we reversed a chancery court's order awarding custody to a mother who had been diagnosed with BPD that required medication and mood stabilizers. *Id*. at 372 (¶3). The mother had also attempted

---

[13] Michael noted the repeated reports Emily had made to therapists over the years of parental abuse. He testified that she told him that her father beat her so badly she could not leave the house. However, at trial Emily admitted that she had lied to her doctors and to Michael, and that there was no "parental abuse"—only that her father slapped her when she was twenty-one and would not clean the house.

28

suicide twice. *Id*. Testimony was presented that the mother had made no real progress in resolving her mental problems. *Id*. In the father's appeal, we reviewed each of the *Albright* factors, and we agreed that the chancellor had favored the father on the physical and mental health factor, but we felt the chancellor did not apply enough weight to the factor based on the facts in the record. *Id*. at 375 (¶18). However, we found the chancellor was wrong in favoring the mother on the stability of the home factor, stating, "We do not see how a woman who had twice tried to kill herself, who admits the stress of raising a child contributes to her mental problems, and whose family has not assisted her can be favored over a man whose parents have practically raised the child and tried to help the woman with her mental suffering through counseling and his removal from certain military work schedules." *Id*. at (¶24). In the case at hand, Emily was never diagnosed with BPD, never attempted suicide, and never attempted to hurt herself or the child. Moreover, unlike the mother in *Divers*, therapy and medication had succeeded in resolving most of Emily's diagnosed conditions, and she had the assistance of her parents and her sister in helping with the child.

¶55.    Nor was there evidence that Emily's job or life circumstances were causing her such stress that it manifested itself in a physical disorder, which happened to the mother in *Gilliland v. Gilliland*, 969 So. 2d 56, 61 (¶¶6-8) (Miss. Ct. App. 2007). There, the mother's counselor testified that the mother suffered from trichotillomania, a stress disorder that caused the mother to pull out her hair. *Id*. at (¶9). There was also testimony that the mother was extremely harsh and impatient with the children and beat them when they needed

29

discipline. *Id*. at (¶10). In the case at hand, Emily had resolved her eating disorder, lost weight, and was off medication at the time of the court's decision. Molly's testimony confirmed how Emily disciplined M.C. in a calm and patient manner. Thus, *Gilliland* is factually distinguishable.

¶56. Michael also points to our recent holding in *Adams v. Adams*, 400 So. 3d 517 (Miss. Ct. App. 2025), which we find supports affirming the chancellor's decision. In that case, the chancellor awarded custody of the parties' minor boy and girl to the mother, despite the GAL's recommendation for joint custody of the boy, and the father appealed. *Id*. at 523 (¶16). Like Michael here, the focus of the father's appeal in *Adams* was on one *Albright* factor, namely the physical and mental health of the parents. *Id*. at 524 (¶19). He asserted that the chancellor ignored the "overwhelming evidence of [the mother's] mental instability." *Id*. We reviewed the chancellor's findings on the other factors and noted that the chancellor favored the father on the physical and mental health factor. *Id*. at 525 (¶23). However, the chancellor had also found that there was no evidence that the mother was a danger to the children or that they would be neglected or abused due to her mental health issues. *Id*. We noted that the mother had had a mental evaluation and was following the treatment plan recommended. *Id*. The chancellor observed the mother's behavior and demeanor and found her to be credible. *Id*. at 525-26 (¶24). We held:

> It was proper for the chancellor to make this determination. This Court has held that the chancellor, by her presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those

30

witnesses.

*Id*. (internal quotation marks omitted). In the case at hand, the chancellor, who was best equipped to hear testimony of the parties and weigh the evidence in light of their credibility, granted physical custody to Emily. Moreover, there was no evidence that Emily had abused or neglected M.C. Emily had been able to wean herself from medication, and her treatable conditions seemed to have resolved. She had developed specific coping skills, and there was no evidence that her ADHD or even PTSD presented a problem affecting the child at the time of trial.

¶57. In a recent custody matter, the Mississippi Supreme Court held:

> [C]hancellors as the fact-finders have the ultimate discretion to weigh the evidence the way he sees fit. We will not reverse the decision of the trial court in such matters when we can confidently say that the chancellor thoroughly reviewed the evidence and made an accurate, well-supported determination under each factor.

*Edwards v. Edwards*, 421 So. 3d 1248, 1254-55 (¶15) (Miss. 2025). In this case, the chancellor heard extensive testimony about Emily's mental-health challenges and how she has dealt with them over the years. From his thorough and detailed sixteen-page opinion, we can say with confidence that the chancellor addressed each *Albright* factor and carefully weighed the evidence. In summary, on the facts of the case at hand, we find that the chancellor's decision was supported by substantial evidence, and we find no reversible error.

**Conclusion**

¶58. For the above and foregoing reasons, we find no merit to Michael's arguments, and

we find that the record supports the chancellor's findings.  Accordingly, we affirm the judgment of the chancery court.

¶59.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**